Jones, J.,
 

 dissenting. In my judgment the method employed to defeat the initiative sounds the knell of the initiative and referendum. It is the most highhanded and arbitrary exercise of autocratic power that I have ever known. To permit a city clerk by his
 
 ipse dixit
 
 to encompass the defeat of a proposed
 
 *166
 
 amendment to the city charter in the way he did vests in a single individual such capricious and despotic political power that I am amazed at its possible consequences. Although it be conceded that the act of the clerk is political, since it nullifies our constitutional guarantees to the right of initiative and referendum, I have yet to learn why this court cannot curb this gross abuse of power by that official. That such abuse may be controlled has been held in
 
 State, ex rel.,
 
 v.
 
 Graves, post,
 
 168.
 

 It is- futile to contend that the refusal to submit the proposed amendment to the city charter was the act of the council, since that body acted solely upon the findings and report of .the city clerk.
 

 Let us examine what the clerk did and the method he employed to annul valid signatures to the petitions for charter amendment. Only 13,010 signatures were needed; more than 36,000 were obtained. The council committee instructed the clerk to check the signatures to ascertain whether sufficient valid signatures had been obtained. He did so, and this was the way he determined their validity: There were 563 petitions in all, presumably circulated by a great number of circulators. Sixty-seven of these petitions contained 4,531 names. Where the clerk found five nonexistent addresses on a petition, the entire petition was discarded. By this means all of the 4,531 signatures were cast aside, although there was no showing made that 3,856 of these signatures were not valid.
 

 Again: One hundred and thirty-nine petitions contained 8,414 signatures. If the clerk found that'two or more names in a petition were in the same handwriting, the petitions were thrown overboard, even
 
 *167
 
 though signed by husband and wife. Thus 8,414 signatures were nullified under the measuring stick of the city clerk. There were thirty-six petitions containing 2,307 signatures. The clerk testified that if one individual denied his signature, it furnished him sufficient cause to discard all the other signatures. We have alluded only to these three classes; but other petitions were also cast aside. The simple fact that some addresses could not be found in the class-first referred to, or that two or more signatures were found to be in the same handwriting, or that one individual denied his signature on a petition, ought not to be held as imputing fraud or bad faith upon the part of the 563 or more circulators. A circulator may have well believed that the signer actually lived at the- address he gave, or that two signatures could be lawfully written by one person if the second signature was written at the second voter’s request; nor should the 2,307 signatures be invalidated because a single signer on a petition* denied the authenticity of his signature. The city clerk testified that he made no investigation to ascertain whether a wife authorized her husband to sign for her in her presence; nor whether others had authorized another to sign their names. So far as the investigation of the city clerk went, he did not attempt to make inquiry of any of the circulators. He evidently assumed that if a few of the signers imposed upon the circulator this justified him in throwing all of the petitions into the discard. The same things that featured in these circulations could occur in almost every case, though citizens of the highest probity' should be engaged in the work.
 

 We go far afield when we rest our decision upon
 
 *168
 

 State, ex rel. Gongwer,
 
 v.
 
 Graves, Secy. of State,
 
 90 Ohio St., 311, 107 N. E., 1018. In that case it was admitted that 20,000 names were forged by the circulators; and it further appeared that the circulators had “been guilty of a systematic course of fraud and forgery” and had “willfully and intentionally sworn to false affidavits” attached to the petitions. There is no such proof here. In fact such a course of conduct is negatived by the testimony of the clerk.
 

 He testified: “ Q. Did you talk with any circulator about the circumstances under which those one hundred and thirty-nine petitions were circulated? A. I did not.
 

 “Q. And do you have any information whatever bearing upon their good faith in circulating those one hundred and thirty-nine petitions? A. I have not.
 

 “Q. Do you have any information about any one of the circulators of those one hundred and thirty-nine petitions leading you to question his or her good faith? A. I have not.”
 

 I am in a quandary about what the other members of the court, approving the capricious and highhanded method of the city clerk, would think if their own petitions for nomination were found to be defective by the canvassing officer, and found to be so just about at expiration of the time for filing the petitions for nomination. Does this decision, permitting a city clerk to exercise such arbitrary powers, connote the death of the initiative and referendum? Will similar exercise by other political officers be likewise upheld? Out of more than 36,000 signatures obtained, but 8,358 were validated. Thousands of the city’s citizens were by a single individual — a
 
 *169
 
 minor officer — deprived of the right of franchise, the privilege of voting upon the form of their local government. Whether we favor the initiative and referendum, or do not favor them, so long as those rights are conferred by our Constitution and laws, it is the court’s duty to safeguard and not to destroy them by upholding the method employed by the city clerk in this case.